1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
11766 Wilshire Blvd., Suite 900
Los Angeles, CA 90025
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com

WILLIAMS & CONNOLLY LLP
Enu Mainigi (*pro hac vice*)
680 Maine Avenue, SW
Washington, DC  20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
emainigi@wc.com

*Attorneys for Carrie L. Tolstedt*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CARRIE L. TOLSTEDT<br><br>Defendant. | Case No. 2:23-cr-00115-JLS-1<br><br>**CARRIE L. TOLSTEDT'S SENTENCING MEMORANDUM**<br><br>**Date:  September 15, 2023**<br>**Time:  9:30 AM**<br>**CTRM: 8A**<br><br>**Hon. Josephine L. Staton**<br><br>***Redacted, Public Version*** |

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ........................................................................ 1

II.  CALCULATION OF THE SENTENCING GUIDELINES RANGE ................ 3

III. 18 U.S.C. § 3553(a) SUPPORTS THE USPO'S SENTENCING
     RECOMMENDATION. ................................................................................. 4

   A. The Nature and Circumstances of the Offense. ........................................ 5
      1. Background ............................................................................................ 5
      2. Sales Practices Receive Additional Scrutiny Due to Media Coverage and a
         Lawsuit ................................................................................................ 9
      3. Ms. Tolstedt's Role in Minimizing Sales Practices Issues in the May 2015
         Memorandum to the OCC ................................................................... 11

   B. Ms. Tolstedt's Personal History and Characteristics. ............................. 16
      1. Ms. Tolstedt's Personal History ........................................................ 16
      2. Ms. Tolstedt's Characteristics ........................................................... 19
         a.   Devoted Daughter and Daughter-in-Law ................................. 20
         b.   Advisor and Mentor .................................................................. 23
         c.   Loving and Reliable Friend ...................................................... 27
         d.   Person of Faith ......................................................................... 30
         e.   Lifelong Volunteer ................................................................... 32
              i.    History of Volunteerism ..................................................... 32
              ii.   Commitment to Food Insecurity ......................................... 34
              iii.  Commitment to Mission Work ............................................ 35

   C. Ms. Tolstedt's ███████████████ ..................................................... 37

   D. A Custodial Sentence Is Not Necessary to Afford Adequate Deterrence or
      Protect the Public. .................................................................................. 40

   E. A Custodial Sentence Is Not Necessary to Achieve Just Punishment and
      Respect for the Law. ............................................................................... 43

   F. The Need to Avoid Unwarranted Sentencing Disparities Supports a
      Probationary Sentence. ........................................................................... 44

   G. Upcoming Amendments to the Sentencing Guidelines Support the USPO's
      Sentencing Recommendation. ................................................................. 46

IV. CONCLUSION ......................................................................................... 47

1

## **TABLE OF AUTHORITIES**

2

Page

### **CASES**

3

*Dean v. United States*, 581 U.S. 62 (2017)................................................................4

4

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................3, 4

5

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010)................................42, 43

6

*United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016)...........................42

7

8

### **STATUTES AND RULE**

9

12 U.S.C. § 1828(x) .................................................................................................14

10

18 U.S.C.

11

    § 2 .......................................................................................................................45

12

    § 401 ..................................................................................................................45

    § 1001 ................................................................................................................45

13

    § 1505 ................................................................................................................45

    § 1517 ..................................................................................................................1

14

    § 3553 ............................................................4, 5, 37, 40, 42, 43, 44

15

    § 7212 ................................................................................................................45

16

Federal Rule of Criminal Procedure 11 ..............................................................1, 3

17

### **OTHER AUTHORITIES**

18

19

*Amendments to the Sentencing Guidelines*, U.S. Sentencing Comm'n (Apr. 27, 2023), https://tinyurl.com/mr2xhfuy .................................................................46

20

*CFPB Fines U.S. Bank $37.5 Million for Illegally Exploiting Personal Data to Open Sham Accounts for Unsuspecting Customers*, https://tinyurl.com/5n88wass...................................................................................7

21

22

*CFPB Orders Citibank to Provide Relief to Consumers for Illegal Debt Sales and Collection Practices*, CFPB (Feb. 23, 2016), https://tinyurl.com/4zjrdvaw ......................................................................................7

23

24

25

Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) ..................42

26

*Many Regulators Put Their Attention on How JPMorgan Marketed Its Funds*, N.Y. Times, July 11, 2012, https://tinyurl.com/muxtahh3..................................8

27

28

iii

*OCC Issues Notice of Charges Against Five Former Senior Wells Fargo Bank Executives, Announces Settlement with Others*, OCC (Jan. 23, 2020), https://tinyurl.com/3uup5cmn.......................................................................11

S. Rep. No. 98-225 (1983)...................................................................................42

SEC Press Release (Nov. 13, 2020), https://tinyurl.com/3mhsx7r9 .......................11

Testimony of John Stumpf (Sept. 20, 2016), https://tinyurl.com/5rmk4u6z ........7, 8

*Three Former Senior Wells Fargo Bank Executives*, OCC (Sept. 21, 2020), https://tinyurl.com/4ywf4eh8 ...........................................................................11

U.S. Dep't of Just., Nat'l Inst. of Just., *5 Things About Deterrence* (2016), https://tinyurl.com/3uwz3yu3..............................................................................42

*United States v. Bender*, No. 13-cr-34-R ................................................................45

*United States v. Casale*, No. 17-cr-20-RGK .........................................................45

*United States v. Mao (Gu Feng)*, No. 17-cr-789-DMG-3 .......................................45

*United States v. Mao (Yin Zhen Mao)*, No. 17-cr-789-DMG-1...............................45

*United States v. Schultz*, No. 15-cr-12, Dkt. 24......................................................44

*United States v. Walker*, No. 11-cr-106-GW ..........................................................45

United States Sentencing Guidelines (U.S.S.G.)
     § 1B1.13............................................................................................................46
     § 2J1.2(a) ...........................................................................................................3
     § 3E1.1 ...............................................................................................................3
     § 4C.1.1..............................................................................................................46
     § 5B1.1...............................................................................................................4

*Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts Without Customer Authorization*, U.S. Dep't of Just. (Feb. 21, 2020), https://tinyurl.com/42r246pu ....................................................11

*Wells Fargo Not Alone: OCC Finds Sales Abuses at Other Banks*, American Banker (June 5, 2018), https://tinyurl.com/2p9xrpas ...........................................7

iv

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.      PRELIMINARY STATEMENT

3

4

The U.S. Probation Office ("USPO") has recommended a sentence of 3 years of

5

probation with a condition of sixth months' home confinement for Carrie Tolstedt, who

6

has entered a binding plea agreement under Federal Rule of Criminal Procedure

7

8

11(c)(1)(C) to one count of obstructing a bank examination in violation of 18 U.S.C.

9

§ 1517.  *See* USPO Recommendation at 1-2, Dkt. 31; Plea Agreement, Dkt. 7.  As the

10

USPO found, Ms. Tolstedt accepts full responsibility for the conduct to which she is

11

12

pleading guilty.  *See* Presentence Investigation Report ("PSR") ¶ 49, Dkt. 32 (noting

13

that Ms. Tolstedt has "clearly demonstrated acceptance of responsibility").  For the

14

reasons that follow, we respectfully request that the Court adopt the USPO's

15

16

recommendation and sentence Ms. Tolstedt accordingly.

17

Ms. Tolstedt, now 63 years old, served as the Senior Executive Vice President of

18

19

Community Banking at Wells Fargo & Company ("Wells Fargo" or the "Bank") from

20

2007 through 2016.  Her plea arises from her involvement in preparing a memorandum

21

that was submitted to the Bank's chief regulator, the Office of the Comptroller of the

22

23

Currency ("OCC"), in May 2015.  The memorandum omitted two types of information,

24

and the omission of this information obstructed the agency's examination of the Bank.

25

Ms. Tolstedt recognizes that "ultimate responsibility regarding the memo to the Office

26

27

28

1

of the Comptroller of the Currency was" hers and is "truly and genuinely sorry" for her actions. Ex. 1 (C. Tolstedt Letter).[1]

In sentencing Ms. Tolstedt, however, the Court should consider the full picture of her character and circumstances—in other words, who Ms. Tolstedt is "beyond the headlines, the pictures, the titles." Ex. 2 (J. Owings Ltr.). Those who know her best describe Ms. Tolstedt as a "a true product of her upbringing" in a small Nebraska town whose unexpected rise in the banking world was the product of decades of hard work and sacrifice—values that Ms. Tolstedt learned as a child in her father's bakery. Ex. 3 (B. Tolstedt Ltr.). Ms. Tolstedt is a devoted daughter, daughter-in law, wife, sister, and aunt; she is an advisor and mentor to youth, a loving and reliable friend, a person of faith, and a lifelong volunteer.

In recommending a sentence of probation, the USPO cited these core traits, as well as Ms. Tolstedt's role in providing valuable support to her aging mother ███████

███████████████████████████████████████████████████

███████████████████████████. *See* USPO Recommendation at 3-5, Dkt. 31; PSR ¶¶ 60-102, Dkt. 32. This recommendation is consistent with the plea agreement, the terms of which the parties spent months negotiating and which provides for an agreed-upon sentencing range of zero to 16 months. Plea Agreement ¶ 14, Dkt.

---

[1] All exhibits are to the Declaration of Enu Mainigi in Support of Carrie L. Tolstedt's Sentencing Memorandum submitted herewith.

2

7.  We respectfully request that the Court accept the plea agreement and impose a sentence consistent with the USPO's recommendation.

## II.    CALCULATION OF THE SENTENCING GUIDELINES RANGE

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  Here, that decision is simplified because the plea agreement—which the parties spent months negotiating—is pursuant to Rule 11(c)(1)(C), and the parties have both agreed on a specific Guidelines calculation and that "a specific . . . sentencing range is the appropriate disposition of the case." Fed. R. Crim. P. 11(c)(1)(C).

As set forth in the plea agreement—and the PSR, whose Guidelines "calculations are consistent with the plea agreement," PSR ¶ 129, Dkt. 32; *see id.* at p.2 and ¶¶ 39-55, 129—the parties have agreed that the appropriate Guideline is U.S.S.G. § 2J1.2(a), which has a Base Offense Level of 14.  The parties further agree to a 2-point reduction for Ms. Tolstedt's Acceptance of Responsibility pursuant to U.S.S.G. § 3E1.1, making the Total Offense Level 12.  Because Ms. Tolstedt has no criminal history, she is categorized as a Criminal History Category I.  This makes the applicable Guidelines range 10-16 months' imprisonment.  In addition, the parties have further agreed that an appropriate sentence is no higher than 16 months' imprisonment, up to three years' supervised release, a fine of $100,000, and a $100 special assessment.  Plea Agreement

3

¶ 14, Dkt. 7.  Under the plea agreement, therefore, the Court has discretion to sentence Ms. Tolstedt to a term of imprisonment between zero and 16 months.[2]

### III.   18   U.S.C.   § 3553(a)   SUPPORTS   THE   USPO'S   SENTENCING RECOMMENDATION.

The factors the Court shall consider in determining an appropriate sentence are set forth in 18 U.S.C. § 3553(a).  That statute requires a sentencing court to consider the "nature and circumstances of the offense," the "history and characteristics of the defendant," and the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  Section 3553(a) also codifies the "parsimony principle," a "broad command that instructs courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the four identified purpose of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation."  *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)).

These factors support the USPO's recommended sentence of three years' probation subject to conditions, including a period of home confinement.  *See* USPO Recommendation at 1, 5, Dkt. 31.

---

[2] As the USPO recognized, the Guidelines do not permit a probationary sentence here because the offense range is in Zone C of the Sentencing Table.  *See* PSR ¶¶ 128, 133; *see also* U.S.S.G.§ 5B1.1.   The Court nevertheless may impose a sentence of probation—as the USPO recommended—because the Guidelines are advisory, not mandatory.  *See Gall*, 552 U.S. at 58-59.  As set forth in section III.F *infra*, district courts in the Ninth Circuit routinely impose probationary sentences on defendants with the same Guidelines calculation as Ms. Tolstedt.

4

## A.     The Nature and Circumstances of the Offense.

Ms. Tolstedt fully accepts responsibility for her offense.  By omitting certain information from the May 22, 2015 memorandum to the OCC, she minimized the scope of sales practices misconduct at the Bank and obstructed the agency's examination.  *See* Plea Agreement ¶ 10, at 9, Dkt. 7.  She recognizes that what she did was wrong, and accepts responsibility for it.

Nonetheless, the nature and circumstances of this offense when viewed with the remaining § 3553(a) factors support a probationary sentence.  As discussed more fully below, the subject matter of the memorandum—sales practices misconduct—was not an issue that was created on Ms. Tolstedt's watch, is an inherent feature of nearly any large bank, and was an issue that Bank officials believed was being appropriately managed in real time.  In addition, far from being the singular work of Ms. Tolstedt, the May 22, 2015 memorandum was a collaborative effort that was drafted by numerous subject-matter experts in coordination with numerous Bank lawyers.   And contemporaneous documents show that the OCC received substantially equivalent information through other channels.

### 1.     Background

For her entire career, Ms. Tolstedt worked in the banking industry, starting as a wire clerk and achieving success beyond what she ever dreamed as a young girl growing up in Kimball, Nebraska.  *See* Ex. 3 at 1 (B. Tolstedt Ltr.).  At Wells Fargo, where she spent the last two decades of her career, she worked her way up to become the head of

5

the Community Bank, the retail banking division that oversaw the local branches.  She served in that role from 2007 to 2016.  PSR ¶ 13, Dkt. 32.  Performance reviews she received in real time praised her "integrity" and "honesty."  Ex. 4 (2015 Review) (WF-SP-02921491).  And colleagues from that time praise her commitment to making the "very best decision for every constituent," Ex. 5 (C. Russ Anderson Ltr.), and "trying to do the right thing," Ex. 6 (J. MacDuff Ltr.).

The factual basis of Ms. Tolstedt's plea involves an issue known as "sales practices misconduct."  That term refers to a type of misconduct that bank employees engaged in either to obtain some benefit (like meeting bonus targets) or avoid some consequence (like getting disciplined).  Plea Agreement ¶ 10, at 7, Dkt. 7.  This type of misconduct included, for example, opening accounts without customer consent, or persuading customers to open accounts that they did not need or intend to use.  Plea Agreement ¶ 10, at 7, Dkt. 7.  Importantly, no one alleges that Ms. Tolstedt ever sold an unauthorized product or encouraged anyone to do so.  ███████████████████

███████████████████████████████████████████  Ex. 7 (6/12/19

Zimmerman  OCC  Tr.  167:7-17)  (OCC-SP00026815).  ████████████████

████████████████████████████████████████████████████████

████████████  Ex. 8 (Carlisle OCC Tr. 136:16-19) (OCC-SP00002731).  Under Ms. Tolstedt's  watch,  the  Community  Bank  offered  extensive  training  to  employees

(including on ethics), established controls to detect potential employee misconduct, and terminated employees who were found to have engaged in sales practices misconduct.[3]

Given Wells Fargo's size—it is currently the country's fourth-largest Bank, and at the time of the events at issue its Community Bank alone had ███████████ ████████, Ex. 9 (Callahan OCC Tr. 107:19-108:19 (OCC-SP00002212)—certain employees at the Bank did engage in sales practices misconduct over the years. This issue predated Ms. Tolstedt's tenure as head of the Community Bank (which began in 2007), as the factual basis acknowledges. *See* Plea Agreement ¶ 10, at 8, Dkt. 7 (referencing awareness of sales practices misconduct no later than 2004). Her predecessor—who later served as CEO from 2007-2016—also acknowledged that Wells Fargo's sales practices issues predated Ms. Tolstedt. Ex. 10 (2002 Stumpf Email) (WF-SP-28992234). Even the OCC concluded that sales practices issues were "***well-known for years throughout the Bank.***" Ex. 11 ¶ 29 (OCC Notice of Charges ("NOC")). Nor is it disputed that sales practices misconduct was an industry-wide issue that extended beyond Wells Fargo. The OCC has concluded that Wells Fargo is "not alone"—having "f[ound] sales abuses at other banks."[4] Citibank,[5] U.S. Bank,[6] and JP

---

[3] Senate Banking Committee Testimony of John Stumpf at 2 (Sept. 20, 2016), https://tinyurl.com/5rmk4u6z.

[4] *Wells Fargo Not Alone:  OCC Finds Sales Abuses at Other Banks*, American Banker (June 5, 2018), https://tinyurl.com/2p9xrpas.

[5] *CFPB Orders Citibank to Provide Relief to Consumers for Illegal Debt Sales and Collection Practices*, CFPB (Feb. 23, 2016), https://tinyurl.com/4zjrdvaw.

[6] *CFPB Fines U.S. Bank $37.5 Million for Illegally Exploiting Personal Data to Open Sham Accounts for Unsuspecting Customers*, https://tinyurl.com/5n88wass.

7

Morgan are just some of the institutions that have faced penalties or scrutiny for the issue.[7]

Moreover, at Wells Fargo, numerous corporate-level control functions outside the Community Bank—including Risk, Ex. 11 ¶¶ 163-164 (OCC NOC); *see* Ex. 12 (2013 Loughlin Email) (WF-SP-31388222, -24); Audit, Ex. 11 ¶¶ 393-394, 398 (OCC NOC); Human Resources, Ex. 13 at 3 (OCC Hardison Order); and the Law Department, Ex. 11 ¶¶ 308, 312, 355 (OCC NOC)—were tasked with ensuring sales practices issues were being appropriately managed.  The involvement of the Law Department— ███ ████████████████████████—was particularly "significant." *Id.* ¶ 312; *see* Ex. 14 (10/2/18 Strother OCC Tr. 20:19-21).  And Audit—which had "unrestricted access" to Bank records—"awarded high ratings to the Community Bank" in "each of the audits conducted between 2012 and 2016 that involved aspects of sales practices misconduct." Ex. 11  ¶¶  393,  413  (OCC  NOC).    As  a  consequence  of  these  efforts,  the contemporaneous view of the Bank's top leadership was that sales practices misconduct was "not systemic." Ex. 15 (2015 Stumpf Email) (WF-SP-30500628).

Ms. Tolstedt undertook significant efforts to address the issue, including by improving performance evaluation systems and reducing sales goals by over 30%.[8] ███ ██████████████████████████████████████████████████ Ex. 16 (2015 Risk/HR Mtg.

---

[7] *Many Regulators Put Their Attention on How JPMorgan Marketed Its Funds*, N.Y. Times, July 11, 2012, https://tinyurl.com/muxtahh3.
[8] Senate Banking Committee Testimony of John Stumpf at 2 (Sept. 20, 2016), https://tinyurl.com/5rmk4u6z.

8

Summary) (WF-SP-31487653).   The Bank's Chief Risk Officer observed that "Carrie . . . has implemented some very good systems to track sales practices," Ex. 12 (2013 Loughlin Email) (WF-SP-31388222, -24), and top Audit leaders praised Ms. Tolstedt directly, telling her:  "While many groups talk about risk management, *you and your team live it*."   Ex. 17 (2016 McLinko Email) (WF-SP-35174234, -35) (emphasis added).   From 2014 through 2016, the Chief Risk Officer and Head of Corporate Human Resources awarded the Community Bank's risk management in connection with sales practices the "highest possible" rating in memoranda submitted to the CEO, the Board, and the OCC.  Ex. 11 ¶¶ 425-427 (OCC NOC).  Praise for Ms. Tolstedt's efforts did not come only from within the Bank.  In 2015, the OCC similarly rated the Community Bank's risk efforts "effective."  Ex. 18 (2015 OCC Ltr.) (WF-SP-13946892).  ███████████████████████████████████████████████

████████████████████   Ex. 19 (2015 Loughlin Email) (WF-SP-04324870).

### 2. Sales Practices Receive Additional Scrutiny Due to Media Coverage and a Lawsuit

Two events in the 2013-2015 time period resulted in heightened scrutiny around sales practices issues at the Bank:  (1) a pair of newspaper articles; and (2) a lawsuit against Wells Fargo.  Plea Agreement 10, at 8, Dkt. 7; Ex. 11 ¶ 123 (OCC NOC).

The articles, published in October and December 2013 in the *Los Angeles Times*, focused on a set of terminations of Bank employees for sales practices misconduct.  Plea Agreement ¶ 10, at 8, Dkt. 7.  ██████████████████████████████████

9

█████████████████████████████████████████

██████████████████████████████████. Ex. 20 (Najvar OCC Tr. 119:13-20) (OCC-SP00015386).   The way proactive monitoring worked is by tracking employees using certain numerical benchmarks for potential misconduct; if an employee exceeded the benchmarks—known in the Bank as "criteria" or "thresholds"—that were designated as "egregious," he or she would be referred for further investigation. Ex. 21 (2013 Investigation Notification) (WF-SP-36886818, -19). For example, if an employee opened a certain number of accounts in a month that showed signs of potential misconduct, an investigation would be triggered. *Id.* The particular criteria were determined not by the Community Bank alone but by █████ ████████████████████████████████, including the Law Department.   Ex. 11 ¶ 317 (OCC NOC); Ex. 22 (Rawson OCC Tr.) at 92:16-93:24 (OCC-SP00018675). The *LA Times* articles on terminations that resulted from these proactive monitoring efforts garnered significant attention within the Bank.  Ex. 11 ¶ 102 (OCC NOC).

Next, in May 2015, the Los Angeles City Attorney filed a lawsuit ("LA Lawsuit") against the Bank relating to alleged sales practices misconduct.  Ex. 11 ¶ 223 (OCC NOC).  In addition to quickly drawing attention from the highest levels of the Bank, Ex. 23 (2015 Stumpf Email) (WF-SP-15852820), the litigation ultimately caused a stir in the wider industry and significant scrutiny around the issue at Wells Fargo, resulting in the Bank paying over $3 billion in penalties to the Department of Justice and federal

regulators.[9]  The OCC ultimately fined or instituted administrative charges against eight former Bank executives (including Ms. Tolstedt).[10]  And the SEC fined Wells Fargo executives as well (including Ms. Tolstedt).[11]  But despite the OCC and the SEC bringing actions against numerous Wells Fargo executives—including, in the OCC's case, the General Counsel and the Chief Auditor, and, in the SEC's case, the CEO—and despite the industry-wide scrutiny on sales practices at banks beyond Wells Fargo, Ms. Tolstedt is, to our knowledge, the sole executive in the entire industry who has been prosecuted relating to sales practices misconduct.

### 3. Ms. Tolstedt's Role in Minimizing Sales Practices Issues in the May 2015 Memorandum to the OCC

██████████████████████████████████████

███████████████████████████████████████

Ex. 24 (2015.05.11 Byers Email) (WF-SP-04698721).  ████████████

████████████████████████████████████████,

Ex. 25 (2015.05.06 OCC Email) (OCC-Tolstedt-0529578), ████████████

████████████████████████████████████████ Ex.

---

[9] *Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts Without Customer Authorization*, U.S. Dep't of Just. (Feb. 21, 2020), https://tinyurl.com/42r246pu; *see also* Ex. 11 ¶ 132 (OCC NOC).

[10] *OCC Issues Notice of Charges Against Five Former Senior Wells Fargo Bank Executives, Announces Settlement with Others*, OCC (Jan. 23, 2020), https://tinyurl.com/3uup5cmn; *OCC Announces Settlements with Three Former Senior Wells Fargo Bank Executives*, OCC (Sept. 21, 2020), https://tinyurl.com/4ywf4eh8.

[11] SEC Press Release (Nov. 13, 2020), https://tinyurl.com/3mhsx7r9.

11

26 (2015.05.07 OCC Email) (OCC-Tolstedt-0264475); Ex. 27 (2015.05.08 OCC Email) (WF-SP-15852713).

The May 22, 2015 memorandum at issue here (the "May 2015 Memo") was the result. ████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████  Ex. 28 (OCC Memo) (WF-SP-03463281).  Ms. Tolstedt, however, acknowledges her role in omitting two types of information from the May 2015 Memo:  (1) the number of Bank employees who had been terminated (or resigned during investigation) for sales practices issues, which Ms. Tolstedt knew to be "at least 1,000 to 1,200 employees a year"; and (2) that the Bank's proactive monitoring program identified only a small percentage of the employees who might have been committing misconduct, when Ms. Tolstedt knew that the program "employed proactive monitoring thresholds to identify for investigation employees with the most egregious metrics."  Plea Agreement ¶ 10, at 8-9, Dkt. 7.  Against the backdrop of the sharp and sudden increase in attention on sales practices issues, Ms. Tolstedt felt a desire to protect herself as well as her team members from criticism.  She reacted by "minimiz[ing] the scope" of those issues in the May 2015 Memo.  *Id.* ¶ 10, at 9.

Ms. Tolstedt fully accepts responsibility for her conduct and recognizes that she bears "ultimate responsibility regarding the memo to the Office of the Comptroller of the Currency," which counted on her to "be fully transparent and to lead by example."

12

Ex. 1 (C. Tolstedt Letter).  There are, however, two important mitigating factors to consider in evaluating the "nature and circumstances of the offense."

*First*, the May 2015 Memo was not the singular work of Ms. Tolstedt.  *See* Plea Agreement ¶ 10, at 9, Dkt. 7 ("defendant and others participated in the preparation of written materials for a meeting of the Risk Committee of Wells Fargo's Board of Directors (the 'May 2015 Memo')").  Nor was it prepared solely by personnel in the Community Bank who reported to her.  The General Counsel admitted in sworn testimony that his team of attorneys "drafted" the May 2015 Memo together with Community Bank and other subject matter experts. Ex. 11 ¶ 366 (OCC NOC).  As the OCC itself later concluded, the Bank's "Law Department was the repository of critical and comprehensive information concerning all aspects of sales practices misconduct." *Id.* ¶ 308.

*Second*, █████████████████████████████████████████████████████

███████████████████████████████████████.[12]

---

[12] As Wells Fargo's primary regulator, the OCC was deeply embedded in the Bank, deploying a "Resident Team" of examination staff who worked on-site at the Bank that, in 2015, included 68 personnel.  Ex. 29 (OCC Org. Chart) (WF-SP-05234126).  ████████████████████████████████████████████, Ex. 30 (Hollingsworth OCC Tr.) at 239:4-16 (OCC-SP00008139), ████████████████████████, Ex. 31 (7/24/19 Stumpf OCC Tr.) at 382:15-18) (OCC-SP00024608), █████████████████████ ████████████, Ex. 32 (OCC Calendar Entry) (OCC-Tolstedt-0472786), ███████████████ ████████████, Ex. 33 (Bacon OCC Tr.) at 94:8-95:3 (OCC-SP00000368). ███████████████████████████████████████████████████ *id.,* █████████ ██████████████ Ex. 34 (2015 OCC Email) (OCC-Tolstedt-0434959, -62-63).  By statute, federally insured banks may produce privileged

13

1    As to the fact that Wells Fargo terminated more than 1,000 employees a year for

2    sales practice misconduct, *see* Plea Agreement ¶ 10, at 8, Dkt. 7,

17   Ex. 35 (2015 OCC Email) (OCC-Tolstedt-0264524).

18   As to the use of proactive monitoring "thresholds to identify for investigation

19   employees with the most egregious metrics," Plea Agreement ¶ 10, at 8, Dkt. 7,

27   _____

28   materials to federal banking regulators, such as the OCC, without waiving privilege.
     *See* 12 U.S.C. § 1828(x).

14

Ex. 28 (OCC Memo) (WF-SP-03463281, -321-322).

Plea Agreement ¶ 10, at 9, Dkt. 7.

Neither mitigating factor excuses Ms. Tolstedt's conduct. But each, we believe, is relevant to showing why the USPO's recommended sentence is appropriate.

15

**B.     Ms. Tolstedt's Personal History and Characteristics.**

As the PSR reflects, Ms. Tolstedt's personal "history and characteristics" also counsel in favor of a probationary sentence. *See* PSR ¶ 140, Dkt. 32; *see id.* ¶¶ 60-72. The conduct that brings Ms. Tolstedt before this Court stands in stark contrast to every other facet of her life.  Ms. Tolstedt is a devoted daughter and daughter-in-law, wife, sister, and aunt; she is an advisor and mentor to youth, a loving and reliable friend, a person of faith, and a lifelong volunteer.  A non-custodial sentence would appropriately account for the fact that the conduct underlying the plea is an exception to Ms. Tolstedt's life-long history of good character.  It would also allow Ms. Tolstedt to continue providing critical support to her aging mother and in-laws, friends, mentees, church family, and charitable causes.

**1.     Ms. Tolstedt's Personal History**

From childhood, Ms. Tolstedt was molded by her father's "example of hard work and of sacrifice."  Ex. 3 at 1 (B. Tolstedt Ltr.); Ex. 36 at 1 (J. Lindquist Ltr.) ("It is impossible to talk about Carrie's character without recognizing her father's influence.").  Born and raised in Kimball, Nebraska—a small town of about 5,000 people—Ms. Tolstedt worked with her father Arne Christensen at the family bakery on Main Street from the age of eight.  Ex. 37 at 1 (C. Christensen Ltr.); PSR ¶¶ 60, 65, 66 Dkt. 32.  Being a baker had not always been Arne's dream.  Ex. 3 at 1 (B. Tolstedt Ltr.).  Although Arne had hoped to continue his education after returning from the Korean War, plans changed when his mother passed away.  *Id.*

16

The example Arne set for Ms. Tolstedt was defined by his work ethic.  "Arne rose as early as midnight and worked until mid-morning, catching a few hours' sleep before waking up to engage with his kids' after-school activities and dine as a family before heading . . . back to work to do it all over again."  *Id.*  "For eight to ten hours straight, rain or shine, six days a week, Arne stood on the hard floor, alone with his thoughts, preparing the next days' goods."  *Id.*  There was no "paid time off."  Ms. Tolstedt grew up "work[ing] side-by-side with her dad . . ., watching his tireless efforts." *Id.*

Years later, Ms. Tolstedt had the "incredible opportunity to live her father's dream of completing her education" at the University of Nebraska-Lincoln.  *Id.* at 2. For many of her peers, college was "inevitable."  *Id.*  Not for Ms. Tolstedt, who knew that "[s]he needed to be determined, work incredibly hard and fight any self-doubt" to do justice to all of the hard work that her father had put in to give Ms. Tolstedt access to higher education.  *Id.*

In college, Ms. Tolstedt met her husband Brad.  After they began dating, Brad "vividly recall[s] how in awe [he] was of what Carrie could accomplish in a day—even as a college student."  *Id.*  Brad "witnessed firsthand how Carrie managed to do it all: . . . by outworking most everyone around her."  *Id.*

After graduating from the University of Nebraska-Lincoln, Ms. Tolstedt and her husband both began their careers in banking.  "Somewhat of an oddity," Ms. Tolstedt was interested in banking from a young age, having helped her father work the register,

make deposits, and, later, balance the books. *Id.* at 3. Despite having been a far superior student, Ms. Tolstedt was given a less desirable position than her husband immediately after graduation. *Id.* While he was given a job as a credit trainee, she started at the same bank as a wire clerk. *Id.* But Carrie "dug into her work with the vigor and diligence that [have long] defined her." *Id.* Her excellence began to be recognized.

Over the next decade, that trend continued. "At each institution where [she] worked, Carrie always seemed more prepared then her peers, and at each institution . . . , she excelled." *Id.* at 4. Later, after a few years in Ohio at FirstMerit Bank, Ms. Tolstedt returned to Norwest in May 1998—just before Norwest announced the acquisition of Wells Fargo. *Id.* Shortly thereafter, Ms. Tolstedt was chosen to be one of five Regional Presidents in California. *Id.* Her husband Brad recalls Ms. Tolstedt's feeling that Wells Fargo had taken a chance on a small-town Nebraskan without a fancy graduate degree. *Id.* But he knew that Ms. Tolstedt's "work ethic, passion for banking, and deep understanding of finance would shine through. And shine they did . . . ." *Id.*

According to a former longtime colleague, "Carrie worked harder than anyone else I ever knew." Ex. 5 at 1 (Russ Anderson Ltr.). And with his retirement in 2005, Brad was able to observe Ms. Tolstedt's activities more closely. Her day-to-day was exacting:

> Her consistent routine was to rise around 5:00am, get ready and head to work usually arriving no later than 7:00am. She frequently took BART. She would then get home anywhere between 5:30 and 6:30pm and grab a quick bite to eat while sitting at her kitchen desk catching up on emails or completing tasks that carried over from the day. This would go on until

> 10:00pm, at which time she would get on the treadmill or elliptical and exercise until 11:00.  Then on to bed before starting all over again at 5:00am . . . If there was a bank integration or other time sensitive task going on, she would have check-in calls over the weekend.  On top of it all, she traveled coast to coast.  The demands at times were relentless . . . .

Ex. 3 at 5 (B. Tolstedt Ltr.).  Ms. Tolstedt was frequently exhausted.  *Id.*  But that exhaustion was "outweighed by Carrie's sense of obligation to make the most of every opportunity she was given and by her corresponding sense of duty and of gratitude for those opportunities."  *Id.*  In the moments where it all felt like too much, Ms. Tolstedt turned to her dad's example.  Her husband recalls that,

> Once, . . . Carrie mentioned the acronym "PTO" to her dad, to which he responded "what's PTO?"  I know Carrie believed that compared to a twelve-hour day of manual labor beginning at midnight, a long day spent at a desk and working with a team she cared about could hardly be called taxing.  Carrie's father had always been his daughter's biggest cheerleader.  Again, playing in the back of her mind was the idea that she was experiencing a life her dad would have likely loved.

*Id.*

### 2.    Ms. Tolstedt's Characteristics

"But there is so much more to [Ms. Tolstedt] than her career."  Ex. 3 at 5 (B. Tolstedt Ltr.).  Ms. Tolstedt "has a strong set of values that have sustained her through the years"—values that have informed her conduct as a devoted daughter and daughter-in-law, an advisor and mentor to youth, a loving and reliable friend, a person of faith, and a lifelong volunteer.  *Id.*  Consistent with the USPO's findings and the more than two dozen character letters appended as exhibits, Ms. Tolstedt's good character supports a non-custodial sentence, which would allow Ms. Tolstedt to continue the work of

19

caring for her aging mother and in-laws, providing advice and support to her mentees and friends, and volunteering in connection with a number of charitable causes.  PSR ¶ 72, Dkt. 32.

### a.   Devoted Daughter and Daughter-in-Law

As the USPO recognized, the fact that Ms. Tolstedt "is responsible for making the financial and healthcare decisions for her mother" counsels in favor of a probationary sentence.  USPO Recommendation at 5, Dkt. 31.  Like her late father, Ms. Tolstedt "has always put her family to the top of her list of priorities."  Ex. 37 at 3 (C. Christensen Ltr.).  Today, Ms. Tolstedt plays a "critical role" as one of her mother Wanda Christensen's key caregivers.  *Id.*  In rural Nebraska, home healthcare is limited.  *Id.*  Ms. Tolstedt has one sibling, a brother, who explains that his "heavy reliance on Carrie" to care for their mother has increased in the wake of ███████████

████████████████████████████████████████████████████████

████████████████████████████████  *Id.* at 3-4; PSR ¶ 63, Dkt. 32

████████████████████████████  Although Ms. Tolstedt's brother lives near their mother in Nebraska, he is "unable to care for . . . []her," PSR ¶ 64, Dkt. 32, and has "a great deal of fear and concern about what it would mean for [their] Mom to be without Carrie—even for a time."  Ex. 37 at 3 (C. Christensen Ltr.).  The USPO was correct in concluding that a probationary sentence is appropriate to allow Ms.

Tolstedt to continue caring for her aging mother.  *See, e.g.*, PSR ¶¶ 61-64, Dkt. 32; USPO Recommendation at 5, Dkt. 31.

"[Ms.] Tolstedt oversees all health[-]related care for her mother."  PSR ¶ 62, Dkt. 32.  Wanda is 86 years old, and dealing increasingly with health issues.  *Id.* ¶ 61 (██████████████████████████████████████████████████████████████████████████████); *see also* Ex. 3 (B. Tolstedt Ltr.).  ████ ██████████████████████████████████████████████████████ Ex. 3 at 9 (B. Tolstedt Ltr.).  "Carrie [travelled] to be there with her mom for ████████████ *Id.* ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.*  Ms. Tolstedt helped her move in, traveled back for visits, and sent care packages.  *Id.*  After the rehabilitation period, Ms. Tolstedt coordinated her move back home.  *Id.*  It is essential, as the USPO recognized, that Ms. Tolstedt remain available to handle her elderly mother's healthcare.  USPO Recommendation at 5, Dkt. 31.

In addition to assisting with Wanda's healthcare, Ms. Tolstedt "is responsible for handling her mother's finances," PSR ¶ 62, Dkt. 32—"[s]he ensures the bills are paid, her mom's cashflow meets her needs, her taxes are completed, her insurance for her apartment is appropriate, and her minimum distributions are made." Ex. 3 at 10 (B. Tolstedt Ltr.); *see also* PSR ¶ 62, Dkt. 32.  Wanda is no longer capable of handling

these matters independently and Ms. Tolstedt's brother is similarly "unable to handle the financial . . . decisions for their mother." PSR ¶¶ 62, 64, Dkt. 32.

Ms. Tolstedt "also provides emotional support for her mother." *Id.* ¶ 62. That emotional support is particularly essential because her mother is also ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ Ex. 37 at 4 (C. Christensen Ltr.). "Due to her mother's health, [Ms.] Tolstedt has not spoken to her mother about her involvement in the instant offense" for fear "that telling her . . . may cause additional stress that could negatively impact her health." PSR ¶ 61, Dkt. 32. And her husband Brad is "terrifie[d] . . . to think of what would become of Carrie's mother without her daughter to help support her and ensure she has support and care that she needs." Ex. 3 at 10 (B. Tolstedt Ltr.). A non-custodial sentence will allow Ms. Tolstedt to continue her critical service as her mother's key caregiver. USPO Recommendation at 5, Dkt. 31.

Ms. Tolstedt also plays a role in supporting her husband's parents. ███████████ ██████████████████████████████ Ex. 3 at 9 (B. Tolstedt Ltr.). ████████ ████████████████████ *Id.* Ms. Tolstedt "went to his side, slowly rubbing his shoulder and talked him through breathing exercises to help stop his muscles spasms until the proper medication could do its work." *Id.* And, while her father-in-law recovered, Ms. Tolstedt stayed in the home for weeks as a companion for her

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

mother-in-law who has ▮▮▮▮▮ Ex. 38 at 1-2 (J. Goranson Ltr.).  She handled the cooking, cleaning, and other household chores.

In these moments, others are Ms. Tolstedt's sole focus.  After the surgery, Brad's sister thought it was important to tell their father about the upcoming plea agreement because he follows the news so closely.  Ex. 3 at 9 (B. Tolstedt Ltr.).  During the conversation Brad's father became extremely upset.  *Id.*  Brad recalls:

> Carrie calmly stepped in and approached my dad.  She leaned down to his eye level, held his hand, and explained that it was going to be okay.  She apologized that she was the cause of any family pain.  She explained she was prepared to take accountability regarding the plea agreement.  She was steady, caring, loving and provided a sense of peace.  It was beautiful despite the sadness we all felt.  I watched in amazement as Carrie herself was going through incredible anguish and had not slept well for weeks.  She did not think about herself.  She was only concerned about my dad.

*Id.*; Ex. 38 at 2 (J. Goranson Ltr.) ("I will never forget her loving concern to ease someone else's pain while she was enduring her own.").  This Court should conclude, as the USPO did, that Ms. Tolstedt plays an instrumental role "as a devoted daughter and an advocate for her mother's healthcare needs and her in-laws."  PSR ¶ 72, Dkt. 32.

### b.    Advisor and Mentor

Ms. Tolstedt is a devoted aunt and an embodiment of the fact that there are many paths to family.  Children were not "in the cards" for Ms. Tolstedt—a fact that saddens Brad because she is "so wonderful with children and young people."  Ex. 3 at 7 (B. Tolstedt Ltr.); PSR ¶ 68, Dkt. 32.  She "loves to be around them, to listen to them, to support them, to encourage them, and to mentor them."  Ex. 3 at 7 (B. Tolstedt Ltr.);

23

*see also* Ex. 39 at 2 (D. Silversmith Ltr.) (observing that Ms. Tolstedt's "love of children is obvious through both her charitable work and her deep interest in [others'] children and grandchildren."). But Ms. Tolstedt never dwelled on the absence of her own children. Instead, she "gr[ew] to understand that [she] can help other children now and into the future." Ex. 3 at 8 (B. Tolstedt Ltr.).

Ms. Tolstedt is an aunt to nieces and a nephew who "treasure" their relationship with Ms. Tolstedt "more than she will ever know." Ex. 40 at 1 (L. Goranson Ltr.). The bond Ms. Tolstedt formed with her nieces and nephew began in childhood with time spent "reading books, and exploring [their] imaginations, and singing songs ([a] favorite was 'Hey, good lookin' – what ya got cookin?')." *Id.* On holidays, "the girls would wait for [Aunt Carrie] and Uncle Brad" to arrive so that they could "snuggle on the couch" and "tell Aunt Carrie about all they were doing at school and with friends." Ex. 37 at 2 (C. Christensen Ltr.). Their bond endures to this day. Ms. Tolstedt is a source of advice as her nieces and nephew navigate their adult lives. Lauren Goranson feels that her Aunt Carrie "is a voice of reason when [she is] looking for advice, especially as [she] navigate[s her] professional career." Ex. 40 at 1 (L. Goranson Ltr.). After decades of being "supported, encouraged, and taught" by Aunt Carrie and Uncle Brad, it is no surprise that Lauren feels that she and her "brother . . . are extensions of them." *Id.*

Ms. Tolstedt's commitment to mentorship extends beyond her family, touching the lives of friends who feel they will "never be able to repay Carrie for the love she has

24

shown [their] children." Ex. 41  at 2(Robert Mitchell Ltr.).  Robert Mitchell, a college friend of Ms. Tolstedt's notes that his daughter Morgan "looks to Carrie as a mentor." *Id.*; *see also* Ex. 42 at 1 (Rondi Mitchell Ltr.) ("Carrie has been a mentor to my children, and they adore her.").  Michael Hupp, another of Ms. Tolstedt's college friends, values Ms. Tolstedt's "compassionate" approach to his daughters Annie and Ellie, to whom Ms. Tolstedt has "always been very willing to provide personal and professional counsel."  Ex. 43 at 1 (M. Hupp Ltr.).  Julie Taylor, a friend of Ms. Tolstedt's since college, recalls sending her sons to stay with the Tolstedts, during which time Ms. Tolstedt "adjusted her busy schedule to make sure she was . . . mak[ing] time to talk and catch up with each of [Julie's] sons."  Ex. 44 (J. Taylor Ltr.).

Those connections have had an undeniable impact.  One day, after a long hike spent talking, Morgan Mitchell came back to Ms. Tolstedt's home to freshen up.  Ex. 45 at 2 (M. Mitchell Ltr.).  Ms. Tolstedt called her into a guest room and said simply, "[T]his is your bedroom if you ever need a place to stay."  *Id.*  The comfort of the knowledge that she has "Carrie's unconditional support" has never left Morgan.  *Id.* Annie Hupp, the daughter of Ms. Tolstedt's friend Michael Hupp, attributes the fact that her father is one of the most supportive people in her life to "Carrie's counsel on how to help young women develop their careers."  Ex. 46 at 1 (A. Hupp Ltr.).  Annie knows that Ms. Tolstedt's "mentorship has been impactful [for her] at many crossroads"— from changing her major to mid-career transitions.  *Id.*  Ms. Tolstedt's ready provision of "guidance" and "support" have shown Annie what it means to "truly live [] advocacy

for woman in the workplace." *Id.* And Rondi Mitchell feels her son Nicholas's time with Ms. Tolstedt "added to the foundation which molded him into the wonderful adult he is today." Ex. 42 at 1 (Rondi Mitchell Ltr.).

Ms. Tolstedt also invested heavily in mentoring her colleagues at Wells Fargo, who remember Ms. Tolstedt as "a selfless leader who dedicated tremendous time and energy to creating opportunities for young people of diverse backgrounds . . . ." Ex. 47 at 1 (K. Zimmerman Ltr.). Jason MacDuff recalls that Ms. Tolstedt "took an interest in [his] career right away" and "shocked" him when she, "a very busy and senior bank official, showed up one day to [his] Security Analysis and Portfolio Management class, where she sat with [him] as [they] learned about the efficiency frontier of investing." Ex. 6 at 1 (J. MacDuff Ltr.). That mentorship "deeply influenced [him]" and to this day Mr. MacDuff considers it "a tremendous gift to [him] and [his] family." *Id.*

Ms. Tolstedt's gift for connecting with people, "especially children," has extended further still—beyond the lives of her friends and their children—as part of her mission work. Ex. 48 at 1-2 (J. Shaw Ltr.). Carrie has served on a number of mission trips "partnering with the Tsimshian Tribe in Alaksa." *Id.* The Tsimshian "are a very reserved people and live on the only reservation in Alaska." *Id.* For years, an extremely proud member of the Ravin Clan declined the group's invitation to dine with them. *Id.* It was Ms. Tolstedt who changed the tenor of that relationship by bonding with that tribe member's granddaughter, to whom Ms. Tolstedt spent hours reading. *Id.* That

"engag[ement] with the community" and "bec[oming] fast friends with a little girl" is "[t]ypical Carrie."  Ex. 49 at 2 (D. Riley Ltr.).

### c.   Loving and Reliable Friend

To her friends, who describe her as "compassionate, generous and someone of the highest character," PSR ¶ 72, Dkt. 32, Ms. Tolstedt has been a wellspring of love and care.  Just as "every person that entered the door of the Bakery knew they were important to [her father Arne Christensen]," Ms. Tolstedt has ensured that every person who has entered her life is supported.  Ex. 37 at 1 (C. Christensen Ltr.).

Several friends wrote about Carrie's care for them when they faced significant health issues or personal challenges.  ██████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████  Ex. 44 at 2 (J. Taylor Ltr.).  ███████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████  Ex. 50 at 2 (C. Gorman Ltr.).

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████  Ex. 49 at 1 (D. Riley Ltr.).

But Ms. Tolstedt is not just supportive during life's "big moments"—she handles the day-to-day of friendship with that same care and concern.  Earlier this year, Donna

27

Romanow was busy readying her home for a gaggle of visiting college students.  Ever the baker's daughter, Ms. Tolstedt arrived at the door "with enough home-made granola and home-made chex-mix to feed a small army."  Ex. 51 at 2 (D. Romanow Ltr.); *see also* Ex. 52 at 1 (C. Colby Ltr.) ("I have been the recipient more than once of food Carrie has prepared.  Sometimes it is simply because she made something she knew I liked.").  When Terri Ritter became unable to join the regular group for hikes because of ███████, "Carrie continued to call [her], suggesting [they] just walk around the neighborhood and catch up."  Ex. 53 at 1 (T. Ritter Ltr.).  Catherine Colby describes Ms. Tolstedt as "by far the [friend] who makes herself most available if one of us needs any kind of help."  Ex. 52 at 1 (C. Colby Ltr.).

Nearly all of Ms. Tolstedt's friends remark on her gift for "mak[ing] you feel like you're the only person in the room," listening always "to hear, not to respond."  Ex. 38 at 2 (J. Goranson Ltr.).  Many have benefitted from Ms. Tolstedt's "mindful and present [approach to] her conversations," confiding things in Ms. Tolstedt that they have not otherwise been comfortable discussing.  *Id*.  For example:

- ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████  Ex. 51 at 1 (D. Romanow Ltr.).  ███████ ████████████████████████████████████████████ *Id*. ██████ ████████████████████████████████████████████

1  ███████████████████ *Id.* ████████████████████████████

2  ██████████████████████████ *Id.* ██████████████████

3
   • ██████████████████████████████████████████

4

5  ████████████████████████ Ex. 54 at 1-2 (K. Page Ltr.). █████████████

6  ███████████████████████████████████████████████████ *Id.* at 2.

7

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████ *Id.*

10
   • ██████████████████████████████████████████████

11

12 ███████████ Ex. 55 at 1 (H. Smedsrud Ltr.). ██████████████████████

13 ██████████████████████████████████████ *Id.* ████████████████

14

15 ██████████████████████████████████████████████████████████

16 █████████████████████████ *Id.*

Those who worked with Ms. Tolstedt at Wells Fargo recall her supportive approach—particularly to historically marginalized communities.  Ms. Tolstedt "was adamant in her support of the LGBTQIA+ community."  Ex. 5 at 1 (C. Russ Anderson Ltr.).  Jason MacDuff fondly recalls Ms. Tolstedt's support of his "AIDS Lifecycle rides" for charity as well as "walking with Carrie and hundreds of co-workers in the San Francisco Pride Parade."  Ex. 6 at 2 (J. MacDuff Ltr.).  As Ms. Tolstedt would say: "be YOU, because you can't be anyone else!"  *Id.*  That support of the LGBTQIA+ community extended to her colleagues' personal lives as well.  When her colleague Claudia Russ-Anderson's "youngest came out as Transgender in 2010 [Ms. Tolstedt]

29

was one of the first people [she] told." Ex. 5 at 1 (C. Russ Anderson Ltr.).  And when

Ms. Russ-Anderson's "family 'came out' in 2011 [Ms. Tolstedt] was there to provide

the personal and professional support that was unusual at the time." *Id.*

Ms. Tolstedt's "enduring friendship[s] owe[] in part to the fact that no matter how

far Carrie moved away from Nebraska, she always stayed true to the Midwestern values

she was raised with—chief among them the value of community, be it family or

friends."  Ex. 44 at 1 (J. Taylor Ltr.).  Her friend since kindergarten, Joan Lindquist,

notes that "[a]lthough [their] paths diverged"—with Joan staying in Nebraska—they

"never lost touch."  Ex. 36 at 2(J. Lindquist Ltr.).  Ms. Tolstedt "has and will continue

to be the truest friend a person could have." *Id.*  Although "[i]t would be easy to imagine

that a person as successful as Carrie may have become unapproachable with the

demands of her job," with Ms. Tolstedt that was "not the case." *Id.*  "Carrie cares deeply

for the people around her and has a grateful heart"—she always has. *Id.*

### d.    Person of Faith

Ms. Tolstedt is, and has always been, actively involved in her church.  The First

English Lutheran Church in Kimball was "the center of her family's life" when Ms.

Tolstedt was young.  Ex. 48 at 2 (J. Shaw Ltr.).  Ms. Tolstedt "went to Bible School on

Sundays and Catechism on Wednesday nights and volunteered at Vacation Bible School

and in all the church plays." *Id.*  Later, Brad recalls that every time the couple moved,

30

"one of the first items on Carrie's list [was] search[ing] out the right church and church family." Ex. 3 at 5 (B. Tolstedt Ltr.).

When Ms. Tolstedt found a new church home, she used her gifts to serve. Reverend Ronald Dunn, Ms. Tolstedt's pastor for more than a decade, recalls that Ms. Tolstedt invested her considerable financial skill in the work of the church—albeit "in ways that were not often highlighted in the church newsletter." Ex. 56 at 1 (R. Dunn Ltr.). For example, Ms. Tolstedt "was instrumental in helping [to] forge a plan that would move [the church], a congregation, from a somewhat passive approach to goal setting to one that was much more passionate and proactive." *Id.* And that was in addition to her "quiet[] and faithful[] support" though "financial giving"—support that "enabled [the] congregation to keep its balance, financially, in some rather challenging times." *Id.* at 1-2.

Ms. Tolstedt also consistently made time to participate in church activities. The pastor at her next church, Reverend Jeanie Shaw, recalls that Ms. Tolstedt was "active as a liturgist reading Scriptures for our worship services and volunteering at our Vacation Bible School." Ex. 48 at 1 (J. Shaw Ltr.). Ms. Tolstedt was also one of the church's most faithful volunteers. *Id.* Ms. Tolstedt served regularly in the community food bank, stocking shelves in the warehouse and bagging food for those in need. *Id.* "She also stuffed backpacks for our school children and always volunteered for our yearly God's Work Our Hands," among other efforts. *Id.*; *see* Section III.B.2.f, *infra*.

But, perhaps most importantly, Ms. Tolstedt's faith has always been the center of her inner life.  Brad, her husband of more than forty years, observed that Ms. Tolstedt has prayed daily for as long as he has known her.  Ex. 3 at 6 (B. Tolstedt Ltr.).  And, on occasion, Ms. Tolstedt has asked him to pray with her.  *Id.*  He writes: "It is hard to imagine a better window into a person's character than listening to them talk to God.  I cannot adequately express how plain the goodness of her heart is in those quiet moments as her prayers express [gratitude] and a focus on others."  *Id.*; *see also* Ex. 56 at 2 (R. Dunn Ltr.) ("[F]aith, for Carrie, [i]s not something that exist[s] on the periphery of her life, but something that [i]s central to every facet of it."); *see also* Ex. 6 at 2 (J. MacDuff Ltr.) ("I know her as a person of faith . . .").

### e.  Lifelong Volunteer

#### i.  History of Volunteerism

Ms. Tolstedt "is charitable and always willing to give back."  PSR ¶ 72, Dkt. 32. The attached chart summarizes the numerous contributions that Ms. Tolstedt has consistently made to a variety of charitable causes over her lifetime.  Ex. 57 (Volunteerism Chart).

Her volunteerism is traceable to childhood.  In Kimball, Ms. Tolstedt served as a "Candy Striper, fundraising with bake sales, caroling in the local skilled nursing facility, and playing her saxophone in the park during summer concerts or at the cemetery on Memorial Day."  Ex. 3 at 6 (B. Tolstedt Ltr.).  In college, Friends saw "her strong values in action many times," Ex. 58 at 1 (S. Schmidt Ltr.), including "serving as a Junior

32

Achievement advisor off campus, participating in a community service project known as Honey Sunday that raised money to support the disabled, and helping with the Blood Drive during Greek Week," Ex. 3 at 2 (B. Tolstedt Ltr.).  Scott Schmidt recalls his experience co-chairing an event for a local homeless shelter with Ms. Tolstedt, writing: "I was focused on the details of the event, but Carrie was focused on the residents of the shelter and how we could do more for them."  Ex. 58 at 1 (S. Schmidt Ltr.).  That commitment inspired others to "get more involved and work harder."  Ex. 43 at 1 (M. Hupp Ltr.).

Even during her career at Wells Fargo, Ms. Tolstedt found time to give back.  She participated in "[p]aint-a-thons, Habitat for Humanity, [joined] in various local volunteer activities with her team at Wells Fargo, and support[ed] others in their fundraising."  Ex. 3 at 6 (B. Tolstedt Ltr.); *see also* Ex. 6 at 2 (J. MacDuff Ltr.) (discussing speeches Ms. Tolstedt "gave to classrooms for Junior Achievement where she served on the Board of Directors, Giving Breakfasts where leaders were encouraged to support local non-profit organizations, supporting volunteerism and fundraising for worthy causes using company time . . .").  "When [Ms. Tolstedt] was invited to speak to students at the University of Nebraska, she found the time."  Ex. 3 at 6 (B. Tolstedt Ltr.).  And, in service of her longtime passion for financial literacy, Ms. Tolstedt "served on the Board of Junior Achievement in Northern California."  *Id.*  "In fact, she taught the curriculum in local schools and was asked to speak to students about jobs in financial services."  *Id.*  And after her retirement, those around her saw Ms. Tolstedt's "love for

33

volunteerism explode." *Id.*   Reverend Jeanie Shaw, one of Ms. Tolstedt's pastors, recalls that Ms. Tolstedt had "made a promise that she would work the first half of her life and volunteer the second half"—and "[s]he has taken that promise seriously."  Ex. 48 at 1 (J. Shaw Ltr.).  Ms. Tolstedt "is a committed volunteer as Jesus said, 'to the least of these.'"  *Id.*

### ii.   Commitment to Food Insecurity

"Food insecurity is a particular passion of [Ms. Tolstedt's]—ever the baker's daughter."  *See* Ex. 3 at 6 (B. Tolstedt Ltr.); *see also* Ex. 50 at 1 (C. Gorman Ltr.) ("Food insecurity, in particular, is a major focus of Carrie's as the daughter of a baker.").  For years, Ms. Tolstedt has regularly volunteered at Andre House—a ministry to the poor and homeless population in Phoenix Arizona founded by two priests in 1984.  *See* Ex. 59 at 1 (T. Crotty Ltr.).  "A typical volunteer night at Andre House means arriving by 3pm, working on meal preparation until 5:15pm, serving dinner until 6:30pm, and then cleaning the kitchen and large cafeteria style dining hall until roughly 7:30pm."  *Id.* Thomas Crotty, who has "observed Carrie in action at Andre House for several years" writes that she "truly embodies Andre House's ethos of 'recognizing the dignity of each person.'"  *Id.*  Ms. Tolstedt "whole heartedly engages with all the guests, spreads energy and positivity in her interactions, and most importantly, is incredibly empathetic to the unfortunate souls who come to Andre House looking for an oasis off the streets."  *Id.*

Ms. Tolstedt also volunteers with a variety of other organizations with a nexus to food insecurity.  Ms. Tolstedt is a regular volunteer at St. Mary's Food Bank, where her

34

"normal day . . . is a two-hour shift spent emergency box packing."  Ex. 43 at 2 (M. Hupp Ltr.).  St. Mary's is Arizona's largest food bank and "provides food to hungry families throughout Phoenix and [nine] Arizona counties."  Ex. 51 at 3 (D. Romanow Ltr.).  She has also hosted "Fill-the-Freezer" events for Ryan House, "a Phoenix-based 'home-like facility' for pediatric respite, palliative, and end-of-life care."  Ex. 39 at 1 (D. Silversmith Ltr.).  During these events, attendees contribute freezable pre-made meals for the family members of children who are staying at Ryan House.  *Id.*

That focus on ensuring others in the community need not worry over their next meal is particularly touching in light of ███████████████████████████ ████████████████████████████████████████████████████ submitted as Exhibit 60.  ██████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████  Ex. 3 at 10-11 (B. Tolstedt Ltr.).  ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████  *Id.* at 11 ███████████ ████████████████████████████████████████████); *see also* Ex. 50 at 2 (C. Gorman  Ltr.) (████████████████████████████ ██████████████).  Instead, Ms. Tolstedt focuses on ensuing access to food for others.

### iii.    Commitment to Mission Work

Ms. Tolstedt's service has not been limited to issues around food insecurity or, for that matter, to her community.  Ms. Tolstedt has participated in three mission trips

35

to Alaska organized by her church in service to the Tsimshian Tribe in Alaska.  During those trips, Ms. Tolstedt assisted with "painting, replacing gutters, and digging trenches for new water pipes."  Ex. 48 at 1 (J. Shaw Ltr.).  Pastor Jeanie Shaw recalls that Ms. Tolstedt "always [went] where she [was] needed" and was "happy being in the kitchen helping to prepare the meals as well as down in the mud in the trenches laying pipes." *Id.*  Ms. Tolstedt's friends attest that "[w]hen Carrie talks about these mission trips her eyes light up."  Ex. 51 at 3 (D. Romanow Ltr.).  Because she has returned to the same community, Ms. Tolstedt has "gotten to know the individual residents" who "have become her friends." *Id.*

After the catastrophic fire in Paradise, California, Ms. Tolstedt didn't hesitate to pack a bag and go there to help rebuild a victim's home.  Ms. Tolstedt "worked tirelessly siding a home for a woman who had lost everything in the fire-running for her life when the flames engulfed her home."  Ex. 48 at 1 (J. Shaw Ltr.).  As one of Carrie's pastors, the Reverend Jeannie Shaw, put it: "The tenderness and compassion that Carrie had for this woman was beautiful." *Id.* at 2.  The group had been told by the local contractor that the home's resident would not speak to any of the volunteers. *Id.*  But "[o]n [the] second day, there was Carrie, sitting on the porch of [her] small trailer, listening to the life story of [a] woman who had never shared with any of the volunteers." *Id.*

A non-custodial sentence would allow Ms. Tolstedt to continue her work of being "a committed volunteer as Jesus said, 'to the least of these.'" *Id.* at 1; *see, e.g.*, Ex. 58 at 2 (S. Schmidt Ltr.) ("[O]nce we start visiting about these charities, I can tell she is

very passionate about serving the recipients and trying to help make their lives a bit better."); *see also* Ex. 48 at 1 (J. Shaw Ltr.) ("[Ms. Tolstedt] has been a steadfast leader in our local mission work"); Ex. 50 at 2 (C. Gorman Ltr.) ("[Ms. Tolstedt's] energetic service inspires me."); Ex. 36 at 2 (J. Lindquist Ltr.) ("Carrie always had a true heart for service to others and has exemplified that with her volunteer and mission work."); Ex. 43 at 2 (M. Hupp Ltr.) ("[Ms. Tolstedt] devote[s] substantial time and attention to philanthropic activities."); Ex. 40 at 1 (L. Goranson Ltr.) ("[Ms. Tolstedt]'s compassion and generosity are at the forefront of her actions.  She gives her time and talents to those in need through her caring nature and charitable efforts."); Ex. 6 (J. MacDuff Ltr.) ("I know she will continue to be of service and give back to her communities, and find ways to help make peoples' lives better, as her father did for so many.").[13]

*See* PSR ¶ 140, Dkt. 32

; *see id.* ¶¶ 74-89;

).

*See* PSR ¶ 82, Dkt. 32.                                              USPO

---

[13] Although they are not quoted in this Memorandum, Ms. Tolstedt also submits for the Court's consideration character letters from her friend Michelle Dudley (Ex. 66); her friend Neal Tomlins (Ex. 67); and her niece Kelsey Gray (Ex. 68).



Recommendation at 5, Dkt. 31. █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ Ex. 60 at 1 (████████████ Ltr.). ██████████

████████████████████████████████████████████████████████████

██████████████████████████████████ *Id.* at 2. ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.*; *see also* PSR ¶ 81, fn.

6, Dkt. 32.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ Ex. 61 (██████████████████████████). █████████████████

████████████████████████████████████████████ *Id.* ██████████████████

████████████████████████████████████████████████████████████

████████████ *Id.*; *see also* PSR ¶¶ 83-84, Dkt. 32.

████████████████████████████████████████████████████

████████████████████████████████████ *See* PSR ¶ 85, Dkt. 32; Ex. 60 at 2 (████████

████ Ltr.). ████████████████████████████████████████████

38



*Id.*

*See id.* ¶ 86.

*Id.*

*Id.*

*Id.* at ¶ 88.

*Id.*

*Id.* ¶ 89; Ex. 61 (

).

*Id.*

39

1
2
3

### D. A Custodial Sentence Is Not Necessary to Afford Adequate Deterrence or Protect the Public.

A probationary sentence also sufficiently addresses the "need . . . to afford adequate deterrence to criminal conduct" and to "protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B)-(C). The USPO recognized that the need to "afford adequate deterrence" is a "factor[] that may warrant a variance outside the advisory guideline range." PSR ¶ 140, Dkt. 32.

As to specific deterrence and the protection of the public, Ms. Tolstedt is at no risk of reoffending. As reflected in the PSR, Ms. Tolstedt is a first-time non-violent offender who poses no danger to society. *Id.* ¶¶ 55, 140. She is also retired—and even if she were not, she will never work again in the banking industry, having agreed to a lifetime bar on doing so in resolving the action filed against her by the OCC (in addition to a lifetime bar from serving as an officer or director in any publicly traded company in resolving the action filed against her by the SEC). Ex. 62 at 2-3 (OCC Consent Order); Ex. 63 at 3 (SEC Final Judgment). There is accordingly no risk of her ever again committing the crime at issue—obstruction of a bank examination—or any similar offense.

The significant consequences Ms. Tolstedt has already endured underscore why the interest in specific deterrence is not furthered by adding a custodial sentence. In

40

addition to losing her job in a very public fashion—from a company where she spent most her adult life—Ms. Tolstedt has faced significant financial and reputational consequences. Wells Fargo clawed back from her approximately $65 million in stock options and restricted shares she earned while working there, Ex. 64 (Government Compensation Chart), and she paid over $21 million in additional fines and penalties to the OCC and SEC. Ex. 62 at 4 (OCC Consent Order); Ex. 63 at 3 (SEC Final Judgment). The public vilification of Ms. Tolstedt also has been persistent. Among the media and the public who do not know her, she stands as the villain at the center of Wells Fargo's sales practices troubles. For years after she was fired her name featured on cable news, in newspaper articles, on social media, and even in Congressional hearings—and virtually never in a positive light. An early public report following her departure from the Bank that was released with significant media attention capitalized on her role as head of the Community Bank and was the likely genesis of this narrative.

All of this has come at a real cost to Ms. Tolstedt. ███████████

█████████████████████████████████████████████████

███████████   *See* Ex. 3 at 11 (B. Tolstedt Ltr.). She has been forced to live in a state of constant personal humiliation, knowing that anyone she meets for the first time may not want to meet her for a second time after they type her (uncommon) name into Google.

On top of all of that, now she will live with a felony conviction. Independent of any sentence the Court imposes, a felony record brings with it such "broad ranging"

41

collateral consequences—including on a defendant's "economic, political, and social rights"—that some courts have referred to it as a "modern civil death." *United States v. Nesbeth*, 188 F. Supp. 3d 179, 182 (E.D.N.Y. 2016).  Adding to this a period of incarceration is not necessary to achieving the government's interest in specific deterrence.

The same is true for general deterrence.  Given the consequences just discussed—including the significant negative publicity and civil penalties—this factor already has been met here.  And "[s]ection 3553(a) . . . does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010).  Even the Department of Justice has recognized that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime."  U.S. Dep't of Just., Nat'l Inst. of Just., *5 Things About Deterrence*, at 1 (2016), https://tinyurl.com/3uwz3yu3.  "It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose."  S. Rep. No. 98-225, at 92 (1983).  These principles apply no less in the context of white-collar offenders. *See, e.g.*, Richard Frase *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty.").  The Ninth Circuit's decision in *Edwards* is illustrative.  That case involved the offenses of bankruptcy fraud and a false statement

to a bank.  Even though the Guidelines range was 27-33 months and the defendant had "previously committed a similar crime," the Ninth Circuit affirmed a sentence of five years' probation, including a period of home confinement, and expressly rejected the notion that a custodial sentence was needed to further the goal of general deterrence. 595 F.3d at 1008, 1016-17.

### E. A Custodial Sentence Is Not Necessary to Achieve Just Punishment and Respect for the Law.

As further reflected in the PSR, a custodial sentence also is not necessary to provide "just punishment for the offense" or to "promote respect for the law."  *See* 18 U.S.C. § 3553(a)(2)(A); PSR ¶ 140, Dkt. 32 (describing the "need for the sentence to promote respect for the law" a "factor[] that may warrant a variance").

For reasons discussed in the prior section, Ms. Tolstedt already has endured punishment for her offense.  Further punishment in the form of a custodial sentence is not warranted.

Such a sentence also is not necessary to promote respect for the law.  As the USPO concluded, Ms. Tolstedt has "clearly demonstrated acceptance of responsibility" for her conduct, PSR ¶ 49, Dkt. 32; *see* Plea Agreement ¶ 12, Dkt. 7, and has "demonstrated a respect for the law during her lifetime," USPO Recommendation at 3, Dkt. 31.  She fully acknowledges that what she did was wrong.

43

**F.     The Need to Avoid Unwarranted Sentencing Disparities Supports a Probationary Sentence.**

Finally, a non-custodial sentence also is justified by the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

While there is no similarly situated former Wells Fargo executive to use as the basis for a sentencing comparison—because Ms. Tolstedt is the only one to face criminal liability relating to the events at issue—the statistics on defendants who share Ms. Tolstedt's Guidelines calculation are illustrative and support a sentence of probation here.  A more complete description of these statistics may be found in the attached Exhibit 65, the report of Meredith Patti.

In this District, *every* defendant (4 out of 4) we have identified who was sentenced under Ms. Tolstedt's Guidelines calculation and who—like Ms. Tolstedt—was *over 60 years old* at the time of their sentencing received a sentence of probation.  Within the entire Ninth Circuit, those numbers remain high:  *Over 90%* of such defendants (10 out of 11) received a probationary sentence.

Indeed, this Court has imposed a sentence of probation for a defendant over 60 years old with precisely Ms. Tolstedt's Guideline calculation.[14]  *See United States v. Schultz*, No. 15-cr-12, Dkt. 24.  Further examples *from this District* are illustrative:

---

[14] The discussion of specific cases in this section is based on filings available on the public docket.

- In *United States v. Mao (Gu Feng)*, No. 17-cr-789-DMG-3, the defendant (over 60 years old) pleaded guilty to obstructing an official investigation in violation of 18 U.S.C. § 1505. The Court imposed a sentence of two years' probation. Dkt. 101.

- In *United States v. Mao (Yin Zhen Mao)*, No. 17-cr-789-DMG-1, the defendant (over 60 years old) pleaded guilty to obstructing an official investigation in violation of 18 U.S.C. § 1505. The Court imposed a sentence of two years' probation. Dkt. 80.

Significantly, judges in this District have imposed probationary sentences even where the government sought a custodial sentence:

- In *United States v. Casale*, No. 17-cr-20-RGK, the defendant pleaded guilty to criminal contempt in violation of 18 U.S.C. §§ 401 and 2(b). The government requested a sentence of 16 months' imprisonment. Dkt. 34 at 9. The Court imposed a sentence of three years' probation. Dkt. 39.

- In *United States v. Bender*, No. 13-cr-34-R, the defendant pleaded guilty to making a false statement in violation of 18 U.S.C. § 1001. The government requested a sentence of 13 months' imprisonment. Dkt. 23 at 1. The Court imposed a sentence of five years' probation. Dkt. 27 at 1.

- In *United States v. Walker*, No. 11-cr-106-GW, the defendant pleaded guilty to interfering with tax collection in violation of 18 U.S.C. § 7212. The government requested a sentence of 5 months' incarceration. Dkt. 18 at 1. The Court imposed a sentence of two years' probation. Dkt. 22.

45

### G.     Upcoming Amendments to the Sentencing Guidelines Support the USPO's Sentencing Recommendation.

While Ms. Tolstedt does not argue for any adjustments or departures to her Guidelines calculation beyond those provided for in the plea agreement, *see* Plea Agreement ¶ 13, at 10, Dkt. 7, a probationary sentence with a condition of home confinement also finds support in two upcoming amendments to the Guidelines, scheduled to take effect on November 1 of this year.

The first amendment, to be codified at U.S.S.G. § 4C.1.1, will provide a two-point reduction in the offense level for offenders who have zero criminal history (like Ms. Tolstedt) and whose offense at issue did not involve specified aggravating factors (which are not present here). *See Amendments to the Sentencing Guidelines* at 78-79, 87-88, U.S. Sentencing Comm'n (Apr. 27, 2023), https://tinyurl.com/mr2xhfuy.



These amendments, representing the collective judgment of the Sentencing Commission, lend support for the recommended sentence here in light of Ms. Tolstedt's lack of a criminal history and medical challenges.

46

## IV.    CONCLUSION

Ms. Tolstedt fully accepts responsibility for her offense, and recognizes it was wrong.  But—as the USPO appropriately concluded—a non-custodial sentence is the fair and appropriate result here in light of the surrounding facts, the punishment she has already endured, her lifelong charitable works, her role as a caretaker for her mother, ████████████████████.  It is also a fair result in light of comparable sentences in this District and the Ninth Circuit.[15]

DATED:  September 1, 2023

                                                                   /s/  Enu Mainigi

WILLIAMS & CONNOLLY LLP
Enu Mainigi (*pro hac vice*)
680 Maine Avenue, SW
Washington, DC  20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
emainigi@wc.com

UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
11766 Wilshire Blvd., Suite 900
Los Angeles, CA 90025
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com

*Attorneys for Carrie L. Tolstedt*

---

[15] Should the Court should adopt the recommendation of the USPO, we respectfully request that the terms of any condition of home confinement be designed to permit Ms. Tolstedt to travel to care for her aging mother, who lives in Nebraska, as needed.

47

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the date below, I caused copies of the foregoing document to be served on all counsel of record and the assigned United States Probation Officer via email.

Dated:       September 1, 2023

*/s/ Enu Mainigi*
Enu Mainigi
